UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH LYNN ATCHISON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>　　　　Defendant.<br>_____/ | CASE NO. 1:10-cv-01987-BAM<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Deborah Lynn Atchison, proceeding *in forma pauperis*, by her attorneys, Christenson Law Firm, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Barbara A. McAuliffe, United States Magistrate Judge. Following a review of the complete record and applicable law, this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

I. **Administrative Record**

　A. **Procedural History**

On February 28, 2008, Plaintiff filed an application for supplemental security income, alleging disability beginning January 2, 2007. Her claim was denied initially on May 7, 2008,

and upon reconsideration on August 28, 2008.  On October 10, 2008, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at the hearing on March 23, 2010.  On April 30, 2010, Administrative Law Judge James P. Berry denied Plaintiff's application.  The Appeals Council denied review on September 10, 2010.  On October 21, 2010, Plaintiff filed a complaint seeking this Court's review.

### B.     Factual Record

Plaintiff (born November 21, 1961) testified that she had completed high school and vocational training leading to certification as a nursing aide.  She worked full time in the rehabilitation and cardiac departments of Kaweah Delta Hospital from 1989 to 1999.  From approximately 2005 to 2007, Plaintiff worked as a church receptionist, answering phones, taking messages, creating forms handling mailing, and shopping for different departments of the church.  Although Plaintiff had difficulty lifting some items, such as the turkeys for benevolence boxes, other employees who knew of her chronic back pain were happy to assist her.

Plaintiff described multiple impairments that kept her from working. Plaintiff was depressed and saw a psychologist regularly.  Because of difficulty concentrating, Plaintiff frequently repeated herself.  Her hands shook, and she frequently dropped things.  After multiple falls, Plaintiff began using a cane so that her doctor would not prescribe a walker.  After kneeling or squatting, she had difficulty getting up and sometimes fell.  If she sat too long, she experienced shooting pains in her left leg and buttocks, or her leg, arm, or hand would become numb.  Because her medications made her sleepy, she attempted to stagger taking them to minimize drowsiness.  She had frequent severe headaches.   Each week, Plaintiff had two or three particularly bad days.

Although Plaintiff could lift a turkey, a bag of potatoes, or a gallon of milk, she could not lift that much weight repetitively over a number of hours.  She estimated that she could stand for five or ten minutes and could sit up to thirty minutes, depending on the chair.  She could concentrate for no more than thirty minutes.  In a typical eight-hour day, Plaintiff took a two-hour nap.  She often needed to elevate her leg.

Plaintiff and her husband rented a room from a fellow church member.  Plaintiff kept house there by performing tasks, such as washing dishes, mopping, and sweeping, in stages and resting as she needed to.

**Adult Function Report.**  In a typical day, Plaintiff performed some light housework, such as vacuuming or dusting or doing the dishes of a load of laundry.  She cared for her dogs.  Plaintiff could shop for thirty minutes and took her son along if she would need to purchase anything heavy.  She sang on her church's worship team.

**Medical treatment.**  Plaintiff saw orthopedic surgeon Stephen A. Smith, M.D., in December 2006, complaining of pain in her head, neck, and upper arm as well as numbness in her hands, and numbness and burning under her left heel.  She described her neck as grinding.  Dr. Smith observed a normal gait and no motor or sensory deficit in the upper or lower extremities.  Tinel's sign, Phalen's test, and reverse Phalen's test were negative.  Cervical range of motion was slightly reduced, with pain on extension and flexion.  Lumbar range of motion was markedly reduced.  Dr. Smith's impressions included (1) scoliosis and degenerative disc disease of the lumbar-sacral spine; (2) osteoarthritis; (3) S1 radiculopathy secondary to herniated disc or spinal stenosis; (4) cervical radiculopathy C6 secondary to spinal stenosis or herniated disc; (5) possible left carpal tunnel syndrome; and (6) chronic cervical and lumbosacral sprain and dysfunction.

In January 2007, Dr. Smith ordered MRI, x-rays, and EMG.  Radiologist Spencer Silberbach opined that x-rays of Plaintiff's lumbar spine revealed scoliosis with spondylosis; x-rays of her thoracic spine revealed spondolysis with an endplate irregularity at T5-6; and x-rays of Plaintiff's cervical spine revealed spondolysis with disc thinning and muscle spasm.  X-rays revealed that Plaintiff's pelvis was normal.  Lumbar spine MRI indicated scoliosis and degenerative disc disease at L3-4 with a slight narrowing of the left neural foramen by osteophytes, but no nerve root compression.  The EMG results suggested mild neuropathy at the left wrist and elbow.

///

///

In February 2007, the Tulare Community Health Clinic began treating Plaintiff for anxiety and depression. Nauman Qureshi, M.D., prescribed Lexapro.[1] On February 24, 2007, Dr. Qureshi prescribed Darvocet for headaches and chronic back pain. On February 24, March 24, and May 14, 2007, Dr. Qureshi observed that Plaintiff was doing well on Lexapro.

The records include treatment notes from the Home Garden Center of Adventist Health from November 12, 2007 through April 1, 2008. The notes are largely illegible. The unidentified treating professional diagnosed depression and anxiety.

On May 6, 2008, Roger D. Fast, M.D., prepared a residual functional capacity analysis. Dr. Fast opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand or walk six hours in an eight-hour day; could sit about six hours in an eight-hour day; had unlimited ability to push and pull; could frequently climb ramps, stairs, ladders, ropes, and scaffolds; and could balance, stoop, kneel, crouch, and crawl. Dr. Fast noted:

> Based on lumbar MRI showing scoliosis, and cervical x-rays showing DDD, claimant's allegation of back and neck pain are credible. Despite lack of functional impairment, some restrictions are appropriate due to pain. Similarly, her allegation of wrist pain has credibility based on mildly abnormal NCV even though no functional limitations are described. She is on chronic pain medications which seem to be helping. I think the restrictions of a medium RFC would be appropriate.

AR 206.

On the same day, agency physician Glenn Ikawa, M.D., performed the psychiatric review technique, indicating that Plaintiff had affective and anxiety-related disorders that were not severe impairments.

When Plaintiff began treatment with Dr. Olayinka Omololu at Family Health Care on December 3, 2008, she requested refills of Soma[2] and Vicodin[3] to treat pain from herniated discs

---

[1] Lexapro (escitalopram) is prescribed for depression and generalized anxiety disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/ (July 19, 2012).

[2] Soma (carisprodol) is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve the pain and discomfort of strains, sprains, and other muscle injuries. Lexapro (escitalopram) is prescribed for depression and generalized anxiety disorder. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717/ (July 19, 2012).

[3] Vicodin (hydrocodone bitartrate and acetaminophen) is an opoid (narcotic) pain reliever used to relieve moderate to severe pain. www.drugs.com/vicodin.html (July 19, 2012).

in her lower back and neck.  Dr. Omalolu refilled the prescriptions for one month, directing Plaintiff to obtain copies of her old records before her next appointment.

On January 5, 2009, although Plaintiff was to follow up with Dr. Omololu, she saw William Barreto, PA-C, since her husband had an appointment with him.  Barreto refilled Plaintiff's Soma and Vicodin, and directed her to see Dr. Omololu in February.  On January 26, 2009, Dr. Omololu refilled her prescriptions and referred her to a gastroenterologist for difficulty swallowing.

On March 5, 2009, Dr. Omololu noted:

> I have prescribed Tramadol 50 mg. every 6 hours.  The patient has been taking Vicodin and demands to have Vicodin.  This is addictive.  I explained that it is better to take a non-addictive medication.  I have referred her to a pain specialist for further management.  Refill of Effexor XR 150 mg was done.  The patient is upset that she could not get Vicodin refills today.

XR 256.

On March 6, 2009, psychologist Paul Pasion-Gonzales, Ph.D., saw Plaintiff on referral from Dr. Omololu.  Plaintiff reported little interest, depressed mood, suicidal thoughts, and social anxiety.  Within the past few months, she had lost her job and home, experienced chronic pain, and was forced to live separately from her husband, whose work hours had been reduced.  Plaintiff was tapering her Effexor[4] dosage until she could arrange for coverage of refills by Patient Assistance Program.

On March 19, 2009, Plaintiff contacted Family Health Care to request refills of Soma and Vicodin.  She also saw Dr. Pasion-Gonzales, who noted she was responding well to Effexor SR although she continued to struggle with significant stressors and reported suicidal ideation.  Although Plaintiff was depressed and anxious, Pasion-Gonzales described her as within normal limits for grooming, affect, psychosis, and cognition.

At a March 26, 2009 appointment with Peter Caballes, M.D., Plaintiff reported no improvement with her Vicodin prescription and requested possible titration of medication.  She

---

[4] Effexor (Venlafaxine) is used to treat depression and, in extended release form, to treat generalized anxiety disorder, social anxiety disorder and panic disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947/ (July 20, 2012).

denied recreational drug use.  Dr. Caballes prescribed a higher dose of Vicodin but advised Plaintiff of the possible side effects of Vicodin and advised that her would recheck her urine screen in four weeks.  Because Plaintiff reported that the Patient Assistance Program did not cover Effexor, Dr. Caballes directed tapering of Effexor and prescribed Lexapro.  (Because Lexapro was also not covered, Dr. Caballes prescribed Celexa[5] on April 2, 2009.)

On April 10, 2009, Plaintiff saw Dr. Caballes, complaining of left leg numbness and swelling of her left knee.  The doctor ordered an x-ray.  On April 17, 2009, radiologist Narin Siribhadra, M.D., reported that the x-ray revealed a normal left knee.

When Plaintiff saw Dr. Pasion-Gonzales on April 23, 2009, she had been taking Celexa for about three weeks.  She reported some benefit but also some serious meltdowns, and concluded that her depression had worsened.  Expressing anger at God, Plaintiff told Dr. Pasion-Gonzales that her situation would be most improved if she had a steady family income and could move back in with her husband.  She reported that she had applied for SSI.

On May 8, 2009, Plaintiff told both Dr. Pasion-Gonzales and Dr. Caballes that her depression was improving.  Dr. Pasion-Gonzales noted that Plaintiff was within normal limits for mood, affect, psychosis, and cognition.  Although Plaintiff again reported feeling better on June 8, 2009, Dr. Pasion-Gonzales rated her depressed, although she was within normal limits for grooming, affect, psychosis, and cognition.  On July 2, 2009, Dr. Pasion-Gonzales rated Plaintiff depressed but within normal limits for affect, psychosis, and cognition.

On August 17, 2009, Plaintiff reported that her husband had been approved for SSI, allowing them to rent a room and again live together.  Dr. Pasion-Gonzales noted that Plaintiff was within normal limits for mood, affect, psychosis, and cognition.  On the same day, Plaintiff saw Dr. Caballes, who reported that her pain was stable and renewed her Vicodin prescription.

On September 16, 2009, Plaintiff reported continued worry about her husband's health and confessed that she had resumed smoking several months before.  Dr. Pasion-Gonzales rated

///

---

[5] Celexa (citalopram) is prescribed to treat depression. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (July 20, 2012).

her depressed, although she was within normal limits for grooming, affect, psychosis, and cognition.

On October 9, 2009, Dr. Caballes noted that Plaintiff's pain was controlled. Plaintiff told Dr. Pasion-Gonzalez of a suicide attempt the week before in which she had superficially cut her wrist. She "easily and convincingly agreed to no harm." AR 225. Plaintiff told Dr. Pasion-Gonzalez of her worries about her husband's health, indicating that she did not want to survive him. Following the appointment, Dr. Pasion-Gonzalez spoke with Plaintiff's husband regarding such precautions as securing weapons and sharp knives.

At a follow-up appointment one week later (October 16, 2009), Plaintiff felt less depressed, reporting that her suicidal thoughts were less frequent and less intense. Dr. Pasion-Gonzalez indicated that Plaintiff was depressed, but she was within normal limits for affect, psychosis, and cognition. When Plaintiff saw Dr. Caballes on October 20, 2009, she denied suicidal ideation or thoughts. Dr. Pasion-Gonzales reported that although she was still depressed, Plaintiff continued to improve and was within normal limits of affect, psychosis, and cognition. Plaintiff again reported improved mood on November 3, 2009. Dr. Pasion-Gonzalez again noted continued improvement on November 17, 2009.

On December 15, 2009, Plaintiff reported that a disagreement with her son made her think of wanting to die but she recovered quickly. Plaintiff was within normal limits for grooming, mood, affect, psychosis, and cognition.

On January 15, 2010, Dr. Pasion-Gonzalez completed a mental impairment questionnaire prepared by Plaintiff's attorney. He diagnosed Plaintiff with major depressive disease, recurrent and moderate. Her symptoms included sleep disturbance, mood disturbance, anhedonia or pervasive loss of interest, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and social anxiety. Pasion-Gonzalez had seen Plaintiff fifteen times since March 5, 2009; her mood and suicidal ideation had improved noticeably in the past few months. Her prognosis was fair. In Pasion-Gonzalez's opinion Plaintiff could tolerate moderate stress; her personal stress had been significant. She could be expected to miss work less than once a month due to her impairment or

its treatment.  Nonetheless, Plaintiff would have difficulty working a regular job on a sustained basis since her functioning could be disrupted in periods of high stress and depressive episodes. Dr. Pasion-Gonzalez opined that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration.

On January 27, 2010, Plaintiff told Dr. Pasion-Gonzalez of a "rough month" in which she had visited her son and new grandson, and two nephews moved into the same house where Plaintiff was living.  Dr. Pasion-Gonzalez and Plaintiff discussed stress management techniques.

**Vocational expert.**  Steven Schmidt testified as vocational expert.  He described Plaintiff's prior work as being a nurse's aide (DOT No. 355-674-014, SVP 4).  Although the work of a nurse's aide is typically medium work, Plaintiff performed her job as heavy work. Plaintiff's prior job as a receptionist (DOT No. 237-367-038, SVP 4) was typically classified as sedentary but Plaintiff performed it as light exertion.

For the first hypothetical question, the ALJ directed Schmidt to assume a hypothetical 48-year-old individual, with a high school education, vocational training, and the work experience that Schmidt had just described.  The individual had multiple severe impairments, but retained the residual capacity to lift and carry fifty pounds occasionally and 25 pounds frequently, and to stand, walk, and sit for six hours each.  Schmidt opined that the hypothetical individual could perform Plaintiff's past relevant work.

For the second hypothetical question, the ALJ directed Schmidt to assume that the hypothetical individual had multiple severe impairments, but retained the residual capacity to lift and carry ten to fifteen pounds rarely; stand one to two hours total; walk approximately four hours total and sit five hours total.  The hypothetical individual would have difficulty gripping and grasping with her dominant left hand and difficulty stooping and squatting.  She would have difficulty maintaining concentration for more than thirty minutes at a time.  The individual would need to rest approximately two hours in each work day as well as to elevate the lower left

///

extremity. The individual would be absent from work about two days each week. Schmidt opined that the hypothetical individual could not perform Plaintiff's past relevant work.

For the third hypothetical question, Plaintiff's attorney asked:

> [I]f this person would have moderate difficulty in maintaining concentration, persistence or pace. And moderate is defined as the following. It means more than slight, it is medically and vocationally significant. It is obvious to co-worker's, supervisor's and peer's [*sic*] the deficiency and functioning or in function at least one standard deviation for the mean, but less than two standard deviations for the mean. If this person has moderate difficulties in maintaining concentration, persistence or pace could this person with this definition, could this person perform past relevant work?

AR305.

Schmidt replied, "No." Schmidt further stated that the hypothetical person could not perform any other work in the national economy.

## II.    Discussion

### A.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:     Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:     Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

| | | |
|---|---|---|
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of February 28, 2008. Her severe impairment was degenerative disc disease. This impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926). Plaintiff had the residual functional capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently, and to stand and/or walk six hours and sit six hours in an eight-hour work day. She retained the ability to perform her past work as a certified nursing aide as it is generally performed and as a receptionist. Accordingly, Judge Berry concluded that Plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act.

**B.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal

standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C. Plaintiff's Credibility

Plaintiff contends that the ALJ erred in concluding that her testimony was not credible, providing a laundry list of her physical and psychological ailments. The Commissioner responds that the ALJ's opinion was supported by substantial evidence.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary

techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Judge Berry met these requirements, addressing the credibility of Plaintiff's testimony in a two-page discussion of Plaintiff's residual functional capacity (AR 18-19). After summarizing Plaintiff's subjective complaints, he found that the medical record did not support Plaintiff's claims. Recent medical reports indicated that Plaintiff's pain was stable and that she complained of fewer headaches and other symptoms. The judge noted further that, although Plaintiff claimed to have experienced pain for many years, she had continued to work until 2007. She performed daily tasks including cooking, light house cleaning, shopping, handling finances, and attending

///

church. As set forth in the summary of the agency record above, substantial evidence supported his conclusions.

### D.     Lack of Consultative Examination

The ALJ did not secure consultative examinations of Plaintiff. She contends that was error. The Commissioner responds that the determination not to require consultative examinations of Plaintiff was within the ALJ's discretion.

A disability claimant bears the burden of proving that he or she has a severe impairment. 20 C.F.R. § 912(c). The claimant does so through "complete and detailed objective medical reports of her condition from licensed medical professionals. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999), *quoting* 20 C.F.R. §§ 404.1512(a0-(b); 404.1513(d). Nonetheless, an ALJ has an obligation to assist a claimant in developing a record. *Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001). A consultative examination is one way for an ALJ to supplement an inadequate medical record. *Id.*

The government is not required to incur the expense of a consultative examination for every claimant. *Id.* at 841. It need not request a consultative examination if it can obtain sufficient evidence from the claimant's own medical records. 20 C.F.R. § 912(e). Normally, a consultative examination is required only if additional evidence is required that is not included within the claimant's treatment records or the treatment records present and ambiguity that requires resolution. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). *See also Yanez v. Astrue*, 252 Fed.Appx. 792, 793-94 (9th Cir. 2007).

In this case, Plaintiff's medical records, particularly those from Family Health Care, were legible, detailed, and complete, providing a comprehensive account of Plaintiff's conditions, the tests she had undergone, and the treatment provided to her. No ambiguity or need for additional information is apparent. Although Plaintiff's attorney questioned the absence of a consultative examination at the close of the administrative hearing, after considering that Plaintiff was being treated and receiving medication, he agreed with the ALJ's conclusion that no consultative

///

examination was necessary, particularly in light of Dr. Pasion-Gonzalez's assessment being in the record. AR 305. The ALJ did not err in failing to order a consultative examination.

### E. Step Two: Inclusion of Depression as a Severe Impairment

In two separate contentions, Plaintiff argues that the ALJ erred in failing to adopt the opinions of her treating physician, Dr. Pasion-Gonzalez, and in omitting depression from her severe impairments. The Commissioner replies that because both Dr. Middleton and Dr. Ikawa agreed that Plaintiff's depression was not a severe impairment, substantial evidence supported the ALJ's determination.

In addition to the five-step process outlined above, agency medical and psychiatric consultants evaluate mental impairments using the psychiatric review technique. 20 C.F.R. § 416.920a. If a claimant has only mild limitations in activities of daily living; social functioning; concentration, persistence, and pace; and has no extended episodes of decompensation, a psychiatric impairment is not severe. 20 C.F.R. § 416.920a(d). The agency consultants are responsible for determining medical severity at the initial and reconsideration levels of administrative review of a SSI application. 20 C.F.R. § 416.920a(e)(1). Accordingly, on May 6, 2008, agency physician Glenn Ikawa, M.D., prepared the psychiatric review technique and determined that Plaintiff's affective and anxiety-related disorders were not severe impairments. Dr. Middleton agreed on August 26, 2008. In accordance with the regulations, Judge Berry applied the technique in drafting the hearing decision. 20 C.F.R. § 416.920a(e).

"The Step Two inquiry is a *de minimus* screening device to dispose of groundless or frivolous claims." *Salvatera v. Astrue*, 2012 WL 603205 at * 7 (E.D. Cal. February 23, 2012) (No. 1:10-cv-01464-SKO). *See also Bowen v. Yuckert*, 482 U.S. 137 (1987). At step two of the analysis, the claimant has the burden of producing medical evidence of signs, symptoms, and laboratory findings supporting the conclusion that his or her impairment is severe and can be expected to last more than twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005). "Although the regulations provide that the existence of a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations provide that under no circumstances may the existence of an impairment be

established on the basis of symptoms alone." SSR 96-4p.  Nor may the existence of a severe impairment be based on the claimant's own testimony of his or her symptoms.  20 C.F.R. § 416.920(c).

The mere existence or diagnosis of an impairment is not sufficient to sustain a finding of disability.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993); *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990); *Key*, 754 F.2d at 1549.  Even if the claimant is diagnosed with a listed impairment, that impairment may not qualify as a severe impairment is the impairment is not severe enough or if the claimant has not had it for a sufficient length of time. See e.g., *Kennedy v. Sullivan*, 919 F.2d 144 (table), 1990 WL 177973 (9th Cir. November 15, 1990) (No. 88-15609). If the medical evidence indicates only a slight abnormality or combination of slight abnormalities that have no more than a minimal effect of the claimant's ability to work, the abnormality or combination of abnormalities is not a severe impairment.  SSR 85-28.   If a claimant's impairment is not severe, the ALJ must find the claimant not to be disabled at step 2.  *Wafer v. Sullivan*, 1994 WL 141649 at *4 (N.D. Cal. April 13, 1994) (No. C-92-3763 EFL); 20 C.F.R. § 416.920(a)(4)(ii).

A severe impairment is one that significantly limits the claimant's physical or mental ability to perform basic work activities.  *Wafer*, 1994 WL 141649 at *4; 20 C.F.R. § 416.920(c). Basic work activities include "the abilities and aptitudes to do most jobs," including "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apabilities for seeing, hearing, and speaking; (3) [u]nderstanding carrying out and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6) [d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b).  In determining the severity of an impairment, an ALJ need only find that the claimant retains the specific ability or aptitude. *Yanez*, 252 Fed.Appx. at 793.  For example, in *Yanez*, that the ALJ found that Yanez could walk effectively after his knee was surgically reconstructed was sufficient.  *Id.*

Plaintiff argues that because Dr. Pasion-Gonzalez was her treating psychologist, the ALJ was required to accept the doctor's opinion that her depression resulted in moderate limitations

and was therefore a severe impairment.  Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ "may disregard the treating physician's opinion whether or not that opinion is contradicted." *Id.* at 751.  If he or she decides to reject an uncontradicted opinion of a treating or examining medical physician, he or she must articulate clear and convincing reasons supported by substantial evidence in the

record. *Matthews*, 10 F.3d at 680; *Lester*, 81 F.3d at 831. The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). He or she need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel*, 172 F.3d at 1113; *Magallanes*, 881 F.2d at 751.

Judge Berry rejected Dr. Pasion-Gonzalez's opinion in favor of the opinions of Dr. Ikawa and Dr. Middleton, finding Plaintiff's psychiatric impairments were not severe under 20 C.F.R. § 416.920a(d)(1) "in that they cause[d] no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration." AR 17. He explained:

> The claimant's treating psychologist Paul [Pasion-]Gonzalez, Ph.D., concluded that the claimant had moderate restriction in activities of daily living, social functioning, and concentration, persistence and pace, and one or two episodes of decompensation. He reported that the claimant was able to handle moderate stress, would be absent less than one day of work a month, showed improvement of her mood on Effexor, and had a fair prognosis. I give Dr. Gonzalez's opinion as to the claimant's limitations little weight because it is not supported by objective evidence of the claimant's testimony. The record indicates that except for some minimal periods of increased depression and anxiety, the claimant has done well on medication.
>
> The State agency psychological consultant[s] concluded that the claimant's mental condition was nonsevere. They noted that Plaintiff was able to prepare meals, remember personal care, do simple chores, drive, go out alone, shop in stores and by computer, remember appointments, attend church, and get along with others. I give this opinion significant weight because it is consistent with the record as a whole.

AR 16-17.

As outlined in the review of the agency record above, the record as a whole supported the agency physicians' conclusions that Plaintiff's depression was not a severe impairment. Plaintiff's treating physicians Dr. Qureshi and Dr. Caballes separately noted that Plaintiff's depression and anxiety were adequately alleviated by medication. Even Dr. Pasion-Gonzalez's own treatment notes contradicted his separate opinion, as he consistently noted, even when Plaintiff was feeling depressed, that her affect was within normal limits. Finally, Plaintiff herself testified that her medication was "very helpful." AR 301. As Judge Berry noted, the treatment

notes consistently reflected that "except for some minimal periods of increased depression and anxiety, the claimant had done well on medication." AR 17. His conclusion was supported by substantial evidence. That Plaintiff would have evaluated the evidence differently is immaterial.

### F. Drowsiness

Plaintiff contends that the ALJ erred in failing to consider and discuss her drowsiness, which was a side effect of her medication, but points to no objective evidence of any side effect of her medication, including drowsiness. The only evidence that Plaintiff's medications caused drowsiness was Plaintiff's testimony that, because her medications made her sleepy, she minimized her sleepiness by staggering the times at which she took those medications. When no objective evidence in the record suggests that a claimant's ability to work was hampered by his or her medications, an ALJ is not required to include a discussion of side effects in the hearing decision. *Roquemore v. Commissioner of Social Security Admin.*, 374 Fed.Appx. 693, 695 (9th Cir. 2010). *See also Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (finding that since the claimant had never raised the issue of fatigue with his doctors, the ALJ properly limited his hypothetical questions to medical assumptions with objective support in the record); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (holding that an ALJ is not required to prepare a function-by-function report for medical conditions or impairments that the ALJ found neither credible nor supported by the record); *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985) (refusing to require the ALJ to address the effect of claimant's narcotic use on his ability to work where the claimant had produced no evidence showing that the narcotics so affected him); *Morillas v. Astrue*, 371 Fed.Appx. 880, 883 (9th Cir. 2010) (finding that the ALJ reasonably discounted the claimant's testimony that her medications made her drowsy where she had neither complained to her physicians of drowsiness nor introduced evidence that her medications affected her functional ability).

Because of the absence of objective evidence confirming Plaintiff's subjective claim of drowsiness, the ALJ did not err in failing to acknowledge and discuss it.

///

///

### III. Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **August 1, 2012**                             /s/ **Barbara A. McAuliffe**
                                                      UNITED STATES MAGISTRATE JUDGE